IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | | |
|---|---|---|
| NORTH DAKOTA HUMAN RIGHTS | § | |
| COALITION, IMMIGRANT | § | Civil Action No. 3:23-cv-00160-PDW-ARS |
| DEVELOPMENT CENTER, and | § | |
| PLAINTIFF DOE | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| PATRIOT FRONT, THOMAS | § | |
| ROUSSEAU, TREVOR VALESCU, and | § | |
| JOHN DOES 1 – 10 | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants, Thomas Rousseau and Trevor Valescu (collectively referred to herein as "Defendants"), by counsel, respectfully submit this memorandum in support of their motion to dismiss Plaintiffs' Complaint (the "Complaint") under Fed. R. Civ. P. 12(b)(6). As grounds therefore, Defendants state as follows:

## INTRODUCTION

Plaintiffs' complaint can be summed up as political mudslinging clearly designed to portray these Defendants as having rights unworthy of protection by this Court. The words "racist", "white supremacist", "white supremacy", and "white nationalist" appear collectively over twenty times throughout the complaint. The complaint repeatedly references unrelated acts at the Unite the Right in Charlottesville, Virginia, a supposed act of intimidation (not even related to these Defendants)

1

consisting of nothing more than two white men taking photographs, the 2012 mass shooting at the Sikh temple in Oak Creek, and the breaking of a traffic mirror in Plaintiffs' parking lot. Wisconsin. See Pls.' Compl. ¶ 23-24, 48 – 49, 53. It repeatedly references acts of "intimidation" or "violence" while failing to plausibly plead any actual attempt to intimidate – let alone violence. Despite the thirty-three pages of mudslinging, Plaintiffs' complaint fails to plead *any* claims against Defendants under 42 U.S.C. §§ 1981, 1985(3) or 1986.  Rather, it invites this Court to transform the Ku Klux Klan Act of 1871 (the "KKK Act") into the kind of "general federal tort" for which courts have consistently held are improper for actions such as this. See *McNally v. Pulitzer Publishing Company*, 532 F.2d 69, 74-75 (8th Cir. 1976) (citing *Griffin v. Breckenridge*, 403 U.S 88, 101-02 (1971). This Court should decline Plaintiffs' invitation.

When the background noise that pads the complaint is tuned out, the only acts complained of that would arguably allow for *any* kind of legal remedy, in federal court or otherwise, are: (1) a singular act of graffiti alleged to have occurred on or around September 3, 2022 during which Plaintiffs' storefront was allegedly marked with graffiti consisting of the words "patriotfront.us"; and (2) a separate act of vandalism allegedly committed on or around September 5, 2022 during which an art mural on displayed on the building was repeatedly marked with graffiti consisting of the words "patriotfront.us". Pls.' Compl. ¶ 39, 41. Dissatisfied with only its common law claims, Plaintiffs seek to (a) entice this Court into adopting a precedent that would allow for a federal tort action against any person or group engaged in the dissemination of materials which might cause a person to feel "fear or intimidation on account of race"

(and thus subjecting those with disfavored views to potentially unlimited number of federal civil actions); and (b) conscript this Court into their efforts and those of their attorneys to attack and silence those with whom they disagree.

Defendants would show that Plaintiffs' claims under the KKK Act fail to satisfy basic *Twombly* pleading standards as to the essential elements of intent, causation, and injury, especially in light of the Supreme Court's recent decision in *Counterman v. Colorado* (which elevated the pleading requirements in "true threat" cases). Naturally, it is well settled law that if Plaintiffs' claims under § 1985 fail, their claims under § 1986 fail as well. Additionally, Defendants would show that the common law claims for conversion, trespass, and trespass to chattel fail with respect to Defendants fail because Plaintiffs failed to plead that they personally engaged in any act of vandalism or made any entry onto Plaintiffs' property.

## STANDARD OF REVIEW

A motion invoking Rule 12(b)(6) should be granted if a plaintiff fails "to state a claim upon which relief can be granted." The applicable standard for reviewing such a motion is well stated as follows:

> "[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do" . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement' . . . to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged . . . The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully . . . Where a complaint pleads facts that are

3

'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 665 (2009) (internal citations omitted).

And further:

> "Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – 'that the pleader is entitled to relief.'"

*Id*. at 665.

Finally, the Court in *Twombly* rejected the "just let the case go to discovery and summary judgment" rationale that plaintiffs often invoke in cases such as this one. The Court stated:

> It is no answer to say that a claim just shy of plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management . . . given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, e.g., Easterbrook, Discovery as Abuse, 69 B.U.L. Rev. 635, 638 (1989). (Judges can do little about impositional discovery when parties control the legal claims presented and conduct the discovery themselves). And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage, much less lucid instructions to juries; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no

reasonably founded hope that the [discovery] process will reveal relevant
evidence to support a claim.

*Bell Atlantic v. Twombly*, 550 U.S. 544, 559-60 (2007)

As set forth in the argument section of this memorandum, the standards of
*Twombly* and *Iqbal* directly apply here. The complaint is short on relevant facts and rife
with labels, naked assertions, and conclusions. It is entirely lacking in proper context
and pleads facts that, while "merely consistent" with Defendants' liability, fail the
plausibility requirement. It should further be noted that Plaintiffs are represented by no
fewer than three separate law firms with offices in Washington D.C., San Francisco, CA,
and Bismark, ND respectively. Defendants are indigent and have only the undersigned
counsel at their disposal (who is representing him *pro bono)*. The massive, drawn out,
and invasive discovery propounded by attorneys and law firms seeking to make a
political statement with this case will, in and of itself, be a huge *in terrorem* victory for
the plaintiffs, and probably the only realistic victory they hope to achieve given
Defendants' indigence.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

The complaint sets forth three federal claims against Defendants under 42
U.S.C.§§ 1981, 1985(3), and 1986. Additionally, it brings common law claims for
conversion, trespass, trespass to chattel, and conspiracy theory. All of these appear to
stem from the act of vandalism that allegedly occurred on September 5, 2022 during
which one or more unknown individuals defaced a mural funded by a $45,000.00 grant
from ArtPlace America. See Pls.' Compl. 41 – 46, 64 – 68, 74 – 77, 82 – 83, 87 – 91, 94, 99 –

100, and 104 – 108. In short, these plaintiffs are asking this Court to hear and consider what would ordinarily be a state law vandalism claim. However, Defendants would show that substantially all of the claims against them must be dismissed.

As their "ticket" into federal court, Plaintiffs claim that the acts of vandalism were committed by "white supremacists" or "white nationalists" who are members of a "white supremacist group" or a "white nationalist group" commonly known as Patriot Front. These allegations are their supposed basis for bringing suit under the KKK Act. While Defendants would refute these pernicious labels, even if the Court assumes them to be true for the purpose of considering this motion, the Court must observe that the existence or persistence of racism, white supremacy, or white nationalist sentiment in society at large does not constitute a particularized injury to any person, much less these plaintiffs. If it did, then any number of persons could file an infinite number of civil actions against any number of defendants without end. This has already started happening in other districts as plaintiffs similar to those in this case seek precedent to aggressively expand the KKK Act in such a manner as to deprive groups, like Patriot Front, their constitutional right to organize, campaign, demonstrate, fundraise, and recruit.

Further, even if they could hypothetically do so, Defendants would have no claim against these plaintiffs if they had responded to the alleged acts of vandalism by repeatedly chiding Defendants as "racists", "white supremacists", "white nationalists", or even as "Nazis". Why? Because such terms, especially as they are often used in the modern American lexicon, are expressions of opinion at best and are more often than

6

not used purely as political pejoratives. A person visiting Times Square could likely ask one hundred different random visitors what they consider to a "white supremacist" or a "white nationalist" to be, and a large number of them would likely responds by saying "someone who voted for Donald Trump." As these terms are not statements of fact subject to any reasonable, identifiable, or widely accepted definition, this Court should give them no weight in considering this motion.

The focus of this Court's inquiry should not be on any party's political belief: it must be on whether Plaintiffs' have plausibly plead causes of action against these Defendants for which they are entitled to relief in this forum. They have not.

## ARGUMENT

### A.     All Claims of Plaintiff Doe Should Be Dismissed Because They Are Brought in Violation of Rules 10(a) and 17(a)

The first and most obvious problem with Plaintiffs' complaint is their failure to comply with Fed. R. Civ. P. 10(a) which provides that a complaint shall state the names of all parties. Additionally, Fed. R. Civ. P. 17(a) mandates that "every action shall be prosecuted in the name of the real party in interest". When a party wishes to file a case anonymously, it must first petition the district court for permission to do so. As of the date of filing this memorandum, Plaintiff Doe has neither sought nor obtained leave from this Court to proceed under a pseudonym.

There is a strong presumption against allowing parties to proceed by way of a pseudonym. See, e.g. *Doe v. Blue Cross & Blue Shield United,* 112 F.3d 869, 872 (7th Cir.) ('Blue Cross'); *Doe v. Frank,* 951 F.2d 320, 323-24 (11th Cir. 1992); *Southern Methodist*

*University Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 712-13 (5th Cir.

1979*). The reasons are obvious and compelling. There is a First Amendment interest in

public proceedings, and identifying the parties to an action is an important part of

making it truly public. See *Blue Cross*, 112 F.3d at 872. When a party invokes the judicial

powers of the United States, it invites public scrutiny of the dispute and the proceeding.

The people have a right to know who is using their courts. *Id*. See also *Luckett v. Beaudet*,

21 F. Supp.2d 1029 (D. Minn. 1998).[1]

When considering a request to use a pseudonym, courts generally employ a

totality of-the-circumstances balancing to determine whether the plaintiff "has a

substantial privacy right which outweighs the customary constitutionally embedded

presumption of openness in judicial proceedings. *Doe v Frank,* 951 F.2d 320, 323 (11th

Cir. 1992). In undertaking this balance, courts consider a myriad of factors, such as (1)

whether plaintiff is suing the government or a private individual, (2) whether plaintiff

is required to disclose information of the utmost intimacy, or (3) whether plaintiff risks

criminal prosecution through the information contained in the pleading. *Id.; Wynne &

Jaffe,* 599 F.2d at 712-713. As none of those factors apply in this case, Plaintiff Doe's

claims should be dismissed because – in filing under a pseudonym without first

obtaining leave of this Court – she has failed to state a claim upon which relief can be

---

[1] In many respects, the "cat is already out of the bag". In its investigation of this case, it took counsel less than two minutes to discover that "Plaintiff Doe" is Fowzia Adde, of Moorhead, Minnesota. Apparently, the "fear" and "intimidation: supposedly experienced by Plaintiff Doe in this case was not sufficient to cause her to scrub her online Facebook and LinkedIn presence.

granted. At the very least, Plaintiff Doe should be ordered to re-plead and cure this pleading defect.

**B.     None of the Plaintiffs have standing to bring suit under 42 U.S.C. § 1985(3) and 1986 because the only injuries claimed under that count are entirely amorphous and subjective feelings of "fear" or "intimidation".**

Plaintiffs bear the burden of establishing standing at the time they bring suit. *Carney v. Adams*, 141 S.Ct. 493, 497 (2020). Standing is an essential and unchanging part of the case-or-controversy requirement of Article III of the *U.S. Constitution*. See e.g. *Allen v. Wright*, 468 U.S. 737, 751 (1984). There are three elements to standing. The first of these elements is that the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife,* 505 U.S. 555, 560-61 (1992). Second, there must be a causal connection between the injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant. *Id.* Third, it must be likely that the injury will be redressed by a favorable decision. *Id*. See also *Spokeo v. Robins,* 578 U.S. 330, 338 (2016).

Plaintiffs claim that the acts of vandalism allegedly committed by Patriot Front members and/or approved by Defendants deprived them of "one or more of their rights or privileges as a citizen of the United States, including a right to equal protection of the law, to equal privileges thereunder, [and] to enjoy the International Market Plaza, a place of public accommodation . . . without fear or intimidation on account of race." Plts. Compl. ¶ 68. Those who perpetrated this act, whoever they were, are not alleged to have left any threatening messages. To the contrary, the only message these plaintiffs

allege to have been left by the perpetrators was the website URL of

"PATRIOTFRONT.US". Those who perpetrated the vandalism left no signs or messages

that, in the words of the Supreme Court in *Virginia v. Black*, have 'a long and pernicious

history as a signal of impending violence." 538 U.S. 343, 363 (2011) (referring to cross

burning). In this case, a mere link to the Patriot Front website was neither a

communication to the plaintiffs nor was it a communication about the plaintiffs.  Yet,

from a mere URL, these plaintiffs somehow concluded that a regrettable act of graffiti

was more than an immature act of vandalism and was instead a bellwether for risks to

the physical safety of Plaintiffs, their tenants, and the business invitees of the

International Market Plaza. Plts.' Compl. ¶ 40.

Plaintiffs also fail the "concrete" standing requirement and are instead

attempting to construct a claim under the KKK Act based upon subjective fear alone.

Their logic is "I experienced fear, therefore I was threatened, therefore I was injured,

therefore I have standing." Plaintiffs invite this Court to adopt a precedent under which

mere feelings of fear, without facts objectively describing a true threat, are the basis for

alleging a constitutional violation. The Supreme Court defined an objectively verifiable

true threat as follows:

> "True threats" encompass those statements where the speaker means to
> communicate a serious expression of an intent to commit an act of unlawful
> violence to a particular individual or group of individuals . . . Intimidation in
> the constitutionally proscribable sense of the word is a type of true threat, where a
> speaker directs a threat to a person or group of persons with the intent of placing
> the victim in fear of bodily harm or death.

*Black,* 538 U.S. at 359 – 60. This case, like *Black,* involves subjective feelings of fear. However, this case is devoid of any type of actual confrontation between Plaintiffs and members of Patriot Front. No messages were displayed that could plausibly be interpreted as being a signal of impending violence.

This is nothing more than a vandalism case. These Plaintiffs have alleged that the vandalism– an unlawful, yet entirely non-violent act – instilled in them a subjective fear that was of indeterminate length and indefinite strength. The complaint alleges that some "wondered" whether the acts of vandalism were precursors to an act of mass violence. Pls.' Compl ¶ 49. The Complaint further describes "lingering safety and security concerns", an "increasing fear for personal safety", and self-imposed "limits on the frequency of trips to the market" and a desire to travel there accompanied by others. Pls'. Compl. ¶ 57 – 61. If such subjective claims of fear were deemed sufficient to meet the requirement of concreteness, that requirement would have no real substance. As none of these defendants have suffered a concrete or particularized injury with respect to their claims under the KKK Act, those claims should be dismissed.

**C.** **North Dakota Human Rights Coalition further lacks standing because it has failed to plead any substantive harm caused *any* Defendant.**

The claims stated by the North Dakota Human Rights Coalition (the "Coalition") violate the fundamental principles of standing articulated above in multiple respects. The Coalition describes itself as a non-profit organization dedicated to political activism in the form of changing "laws and attitudes that stand as barriers to residents of North Dakota who do not currently enjoy their full rights.'" Pls.' Compl. ¶ 20. The complaint

does not allege that the Coalition owned the mural, owned the building upon which the mural was located, or that it funded the mural. Rather, it states that "[a]fter the vandalism, staff from the Coalition spent a number of hours helping clean up, therefore limiting the Coalition's ability to otherwise fulfill their mission." *Id*. In addition to the clean-up, the complaint alleges that the Coalition assisted with fundraising efforts for Immigrant Development Center ("IDC") and "galvaniz[ed] support on behalf of communities targeted by Patriot Front in Fargo." *Id*.

The only supposed injury complained of by the Coalition is that time spent on these activities would otherwise have been spent writing grant applications to further its mission. *Id*. Plaintiffs' clearly plead in their complaint that murals were located on a building owned by IDC and that Plaintiff Doe is the Executive Director of IDC. *Id*. at ¶ 18. The Coalition claims to have been deprived, among other things, of its right and privilege to enjoy the International Market Plaza without fear or intimidation on account of race. Plt.'s Compl. ¶ 68. However, this supposed "fear or intimidation on account of race" did nothing to stop the Coalition from its clean-up of the vandalism, fundraising for IDC, or galvanizing of support.

The harm at the crux of this case is the vandalism done to artwork that was not the property of the Coalition or even situated at offices leased by the Coalition. There is no allegation in the Complaint that any defendant or its agents threatened or menaced the Coalition in any way. It does not allege physical harm to the Coalition or any of its staff. Rather, the Complaint only alleges that the Coalition engaged in volunteer remediation efforts after the vandalism had occurred. See Pls.' Compl. ¶ 20, 50. The

12

only harm claimed by the Coalition is its own subjective and emotional response to vandalism that occurred to the property of another and on the property of another. If the Coalition has a cause of action for such a harm, so too must every member of the public (an impossible burden for the Court, these defendants, and any other person who might stand similarly accused in the future). In fact, under the precedent the Coalition is asking this Court to adopt, a potentially unlimited number of new plaintiffs could come forward against Defendants claiming some vague "injury" due to this vandalism. It would be an impossible burden on our courts to manage these cases and an impossible burden on any defendant seeking to defend against them.

To illustrate the Coalition's lack of standing, suppose a claim was brought against an oil company relating to a broken pipeline causing an oil spill. To remediate the environmental damage, hundreds of volunteers descend on the spill sight to assist in cleaning the area damaged by the spill. If the spill occurred on public land, there would be a potentially unlimited number of hunters, anglers, hikers, and other outdoor enthusiasts who would be inconvenienced by the spill and its clean-up efforts. The volunteers helping with clean-up could undoubtedly be spending their time engaged in other activities. Of course, in this hypothetical situation, no person would contend that every volunteer engaged in clean-up efforts or that every person inconvenienced would have a cause of action against the oil company. If they did, the Court can only imagine the number of professional litigants that would join such efforts in hopes of later reaping a windfall by suing an oil company in federal court.  The Coalition has not

suffered a particularized injury and the political nature of the Complaint does not exempt it plausibly pleading such an injury.[2]

**D.**   **Plaintiffs have failed to state a claim under 42 U.S.C. § 1981 because they did not seek to form a contract with Defendants and have failed to identify any contract impaired by the alleged vandalism**

42 U.S.C § 1981 establishes that certain rights are to be protected against impairment by both non-government and state discrimination including the right to "make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." Plaintiffs cannot properly plead a case for denial of full and equal benefit under the law "[b]ecause the state is the sole source of the law, [and] it is only the state than can deny the full and equal benefit of the law." *Adams v. Boy Scouts of Am.- Chickasaw Council,* 271 F.3d 769, 777 (8th Cir. 2001) (citing *Youngblood v. Hy-Vee Food Stores, Inc.,* 266 F.3d 851, 855 (8th Cir. 2001). In fact, the only claim Plaintiffs could potentially bring under § 1981 is a claim for denial of the right to "make and enforce contracts" which is, in fact, the only right specifically mentioned in Plaintiffs' complaint. Pls.' Compl. ¶ 82. Plaintiffs' claims under § 1981 fail nevertheless.

The United States Supreme Court has rejected the notion that § 1981 was intended as a provision intended "fight racial animus in all of its noxious forms, but only of the animus and the hurt it produced were somehow connected to somebody's

---

[2] The Complaint references numerous other expressive acts allegedly attributable to the Defendants generally. The Coalition appears to believe that the content of this expressive activity is reason enough for this Court to adopt a precedent that would suppress it. The First Amendment forbids this.

contract." *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476 (2006). *Id*. at 476. Rather, it has held that a plaintiff cannot state a claim under § 1981 unless it has rights (or would have) rights under the existing (or proposed) contract he wishes to make and enforce. *Id*.at 479 – 480. The Court further held that a § 1981 plaintiff must identify injuries following from a racially motivated *breach* of their own contractual relationship rather than someone else's. *Id*. at 480. These plaintiffs have failed to identify any contracts under which they have rights which have been impaired due to the vandalism. See also *Spirit Lake Tribe of Indians v. Nat'l Collegiate Athletic Ass'n*, 715 F.3d 1089, 1093 (8th Cir. 2013) (holding that, to prove a § 1981 claim by tortious interference, a Plaintiff must show the elements of tortious interference – including the existence of an enforceable contract).

When considering the Supreme Court's holding in *Domino's Pizza,* the Eighth Circuit reiterated in *Gregory v. Dillards, Inc*. that the elimination of the contract requirement in a § 1981 case threatened to transform the statute into a general cause of action for race discrimination in all contexts. 565 F.3d 464, 468 (8th Cir. 2009) (citing *Gregory v. Dillards, Inc*., No. 02-04157, 2005 WL 1719960 at *8 (W.D. Mo. July 22, 2005)). It further reiterated that § 1981 does not provide a general cause of action for racial discrimination. *Id*. (citing *Youngblood,* 266 F.3d at 855). The issue before the Eighth Circuit in *Gregory* was the required showing by a shopper in a retail case alleging racial discrimination. *Id*. at 470. It held that such a plaintiff must show an attempt to purchase, involving a specific intent to purchase an item, and a step toward completing that purchase. *Id*. The Court expressly rejected the notion that a shopper need only enter a

15

retail establishment to satisfy the requirements of § 1981 and quoted the Tenth Circuit in finding that the law requires "interference with a contract beyond the mere expectation of being treated without discrimination while shopping". *Id.* at 470 – 471 (citing *Hampton v. Dillard Department Stores*, 247 F.3d 1091, 118 (10th Cir. 2001); see also *Morris v. Office Max, Inc.*, 89 F.3d 411, 413-15 (7th Cir. 1996) (holding that interference with "prospective contractual relations" was insufficient to state a claim under § 1982, which is "construed in tandem" with § 1981).

Plaintiff will undoubtedly argue that the Court in *Dillard* was focused on the relationship between a merchant and a customer while this case focuses on vandalism by a third party that allegedly impaired some yet-to-be-determined contractual relationship. However, in its analysis if a § 1981 claim in the retail context, the Eight Circuit noted several other cases of importance here. For example, it noted a Seventh Circuit holding that there is no claim under § 1981 when a shopper opts not to contract with a merchant because the shopper is offended by certain racially motivated activity of an employee in a store. *Id.* at 471 (citing *Bagley v. Ameritech Corp.,* 220 F.3d 518 (7th Cir. 2000). It also noted a Fifth Circuit holding under which that court held that "a § 1981 claim must allege that the plaintiff was actually prevented, and not merely deterred, from making a purchase or receiving a service after attempting to do so." *Id.* (citing *Arguello* v. *Conoco, Inc.,* 330 F.3d 355, 358-59 (5th Cir. 2003)).

The *Dillard* case is so important because these plaintiffs are inviting this Court to do something that the Eighth Circuit and other courts have expressly refused: to abandon the contract requirement of § 1981 and transform the statute into a general

federal tort intended to fight racial discrimination in all of its forms. Again, this is not a contractual dispute: it is a vandalism case. The subjective fears of Plaintiffs, their tenants, and others stated in paragraphs 57 – 61 of the Complaint cannot and do not turn this case into a contractual matter. Plaintiffs' claims under § 1981 must be dismissed.

E.   **Plaintiffs' claims under 42 U.S.C. § 1985(3) fail because they have not plausibly alleged that Defendants aimed to interfere with a right protected against both private and official encroachment.**

As with their claims under § 1981, Plaintiffs have invited this Court to adopt a broad and novel use of § 1983(5) which, if permitted, would represent a major and dangerous expansion of this section which contradicts existing case law. The starting point for modern interpretation of § 1985(3) is the Supreme Court's decision in *Griffin v. Breckenridge*. 403 U.S. 88 (1971). In *Griffin*, a group of African-Americans were assaulted by a group of whites while traveling on an interstate highway in Mississippi and the Court found that § 1983 reached private conspiracies as well as those involving state actors. *Id*. at 98 – 99. However, the Court cautioned that, although § 1985(3) could reach private conspiracies, Congress did not intend for it to "apply to all tortious, conspiratorial interferences with the rights of others." *Id*. at 101.

The Supreme Court has since narrowed the scope of acceptable actions under § 1985(3) holding that it "applies only to such conspiracies as are 'aimed at interfering with rights . . . protected against private, as well as official, encroachment.' . . . There are few such rights (we have hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude . . . and, in the same Thirteenth Amendment context,

17

the right to interstate travel. *Bray v. Alexandria Women's Health* Clinic, 506 U.S. 263, 278

(1993) (internal citation omitted). In the discussing the type of conspiracy required, the

Court also stated:

> ". . . it does not suffice for application of § 1985(3) that a protected right be
> incidentally affected. A conspiracy is not "for the purpose of denying equal
> protection simply because it has an effect upon a protected right. The right must
> be "*aimed at*" (emphasis added); its impairment must be a conscious objective of
> the enterprise. Just as the 'invidiously discriminatory animus" requirement,
> discussed above, requires that the defendant have taken his action "at least in
> part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable
> group . . . so also the "intent to deprive of a right" requirement demands that the
> defendant do more than merely be aware of a deprivation of right that he causes,
> and more than merely accept it: he must act at least in part for the very purpose
> of producing it. That was not shown to be the case here, and is on its face
> implausible."

506 U.S. at 275 – 76.

Therefore, to state a claim under § 1985(3), Plaintiffs must allege (1) a conspiracy,

(2) for the purpose of depriving another of the "equal protection of the laws, or of equal

privileges and immunities under the laws;" (3) an act in furtherance of the conspiracy;

and (4) an injury to a person or property, or the deprivation of a legal right. *Federer v.*

*Gephardt*, 363 F.3d 754, 757 - 58 (8th Cir. 2004). As Plaintiffs have alleged a purely

private conspiracy, they must also establish (a) that some racial, or perhaps otherwise

class-based, invidiously discriminatory animus [lay] behind the conspirator's action;

and (2) that the conspiracy aimed at interfering with rights' that are protected against

private, as well as official, encroachment." Id. at 759 (citing *Bray*, 506 U.S. at 267 – 68).

See also *Larson by Larson v. Miller*, 55 F. 3d 1343, 1350 (8th Cir. 1995). As the KKK Act

was not and is not intended to make federal courts a forum to litigate matters of petty vandalism, Plaintiffs' § 1985(3) clearly fail to meet these elements.

It is well settled law that, to the extent that the Complaint alleges that Defendants violated Plaintiffs' right to equal protection under the law, it must be dismissed. See e.g. Pls.' Compl. ¶ 64. This is because none of the defendants are alleged to be state actors. The equal protection issue is most easily addressed using the language of the *U.S Supreme Court in United Brotherhood of Carpenters and Joiners of America, Local 610 v. Scott*:

> "It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority. The Equal Protection Clause does not . . . add any thing to the rights which one citizen has under the Constitution against another. . . [t]he Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals. . . [t]his has been the view of the Court from the beginning. It remains the Court's view today."

463 U.S. 825, 831-32 (1983) (internal citations omitted) The equal protection guaranteed by the Fourteenth Amendment erects no shield against merely private conduct, however discriminatory or wrongful.' *United States v. Morrison*, 529 U.S. 598, 621 (2000) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)).

Lacking a viable equal protection claim, the only way Plaintiffs can plausibly salvage their already shaky § 1985(3) claim is to show that the "right to enjoy a place of public accommodation without fear or intimidation on account of race" somehow implicates interstate travel or the Thirteenth Amendment's prohibition on involuntary servitude. The primary function of the Thirteenth Amendment was to abolish all forms of involuntary servitude. "[T]he words 'involuntary servitude' were . . . intended to cover" other conditions "which might have been a revival of the institution of slavery

19

under a different and less offensive name," In *United States v. Kozminski,* the most recent Supreme Court decision interpreting the Thirteenth Amendment, the Court confirmed that " 'involuntary servitude' necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." 487 U.S. 931, 952 (1988). The enforcement clause of this substantive guarantee by the Thirteenth Amendment was later interpreted as giving Congress the power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States. *The Civil Rights Cases*, 109 U.S. 3, 20 (1883).

Nearly a century later, the Court clarified the scope of Congress's prophylactic legislative authority under Section 2, holding that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968). This power is broad, and "the varieties of private conduct that it may make criminally punishable or civilly remediable extend far beyond the actual imposition of slavery or involuntary servitude." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). But Congress's authority is nevertheless constrained by the requirement that "prophylactic legislation" passed by Congress not effect a "substantive redefinition" of the rights granted by the Thirteenth Amendment. *Nev. Dep't of Hum. Res. v. Hibbs,* 538 U.S. 721, 728 (2003).

The badges and incidents of slavery constitutes a denial of fundamental civil rights that imposes on its victims a "form of stigma so severe" that it is akin to marking

them as a legally inferior group (i.e., a badge of slavery), and thus violates the Thirteenth Amendment. *City of Memphis v. Greene*, 451 U.S. 100, 128 (1981). The Court has most often characterized these "fundamental rights[,] which are the essence of civil freedom," in terms of economic and legal parity with white people—specifically, ensuring that black people have "the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property, as is enjoyed by white citizens." *The Civil Rights Cases*, 109 U.S. at 22. Therefore, the Court has held that "racial discrimination [that] herds men into ghettos and makes their ability to buy property turn on the color of their skin" is a badge or incident of slavery, as is denying black people "the freedom to buy whatever a white man can buy [and] the right to live wherever a white man can live." *Jones*, 392 U.S. at 442-43. The Court has similarly concluded that "racial discrimination that interferes with the making and enforcement of contracts for private educational services" is a badge or incident of slavery. *Runyon v. McCrary*, 427 U.S. 160, 179 (1976). Finally, there have been several cases under which Courts have found that there is a Thirteenth Amendment right to be free from racial *violence.* See e.g. *Fisher v. Shamburg.* 624 F.2d 156 (10th Cir. 1980); *Sines v. Kessler,* 324 F. Supp 3d 765 (W.D. Va. 2018). None of these cases have held that a person has a right under the Thirteenth Amendment to be free from entirely subjective feelings of "fear" or even "intimidation".

The Plaintiffs in this case seek to expand the scope of the KKK Act far beyond a "badge or incident of slavery" by implying into the Thirteenth Amendment a right to be free from conspiracies to deprive people of color the use of any place of public

accommodation. However, they seek to take this theory far beyond the confines of *Fisher* and *Sines* by failing to account for the very real factual gap between an act of physical assault on a person and the allegations in this case concerning the destruction of a piece of art. Allowing a § 1985 case to proceed on mere acts of vandalism would open up the § 1985 action in precisely the way that the Supreme Court in *Griffin* cautioned against: that it be allowed to "apply to all tortious conspiratorial interferences into the rights of others." 403 U.S at 101-02.  It would not only set a precedent that would lead to federalizing a broad array of tort claims, but also lead to serious First Amendment implications: any act causing a person to fear subjective feelings of "fear" or "intimidation" on the basis of race in the use of a public accommodation would potentially have a federal tort claim (even if the message causing such feelings is one protected under the First Amendment).

Defendants recognize that there is a difference between unlawful vandalism and lawful activity protected by the First Amendment. They would show that the crux of Plaintiffs' case is to blur these lines so as to create new federal tort claims against those engaging in unpopular speech that is otherwise lawful. For example, there are a number of places of public accommodation at which courts have upheld a First Amendment right to organize and demonstrate. The First Amendment is not limited to groups with a message similar to that of the Coalition. It extends even to groups with messages that much of the public would find hurtful, hateful, or even intimidating. Plaintiffs' invite this Court to establish that there is a right to be free from "fear" or "intimidation on account of race" in any place of public accommodation. Of course, if the KKK Act were

intended to protect such as "right", the act itself would be unconstitutional because it would provide a federal tort claim to any person claiming to experience such emotional harm resulting from entirely lawful and constitutionally protected activities. Such a precedent should not be established by this or any other court.

**F.     Plaintiffs' allegations fail to satisfy the *mens rea* requirement established in *Counterman v. Colorado*.**

The Patriot Front URL that Defendants allegedly placed and/or authorized to be placed on IDC's property are not threatening in and of themselves. Rather, these plaintiffs *interpreted* them as threatening after taking offense to what they interpreted as the mission of Patriot Front: the conduct of similar activism elsewhere in North Dakota, propaganda they found to be "anti-immigrant" on Patriot Front's website, and other information on that website arguing "that America must be reclaimed from racial and ethnic minorities." Pls.' Compl. ¶ 37, 52. Even if this Court were to find that Patriot Front is a "white supremacist" or "white nationalist" organization, the law protects offensive and hurtful speech on public issues "to ensure that we don't stifle public debate." *Snyder v. Phelps*, 502 U.S. 443, 461 (2011). Moreover, under *Brandenburg v. Ohio*, legal attacks on abstract advocacy, however repugnant to many, must be rejected: only incitement to imminent lawless action may become the basis of government action to stifle speech. 395 U.S. 444, 447 (1969). In basing their claim on emotion alone, Plaintiffs are improperly seeking to use the KKK Act as an end run around basic First Amendment values and protections.

Plaintiffs specifically references the recent U.S. Supreme Court decision in *Counterman v. Colorado* arguing simply that Defendants were aware that the graffiti at issue was painted "alongside minority and immigrant-owned businesses could cause others to 'regard [their] statements as threatening violence.'" Plts' Compl. ¶ 12; 143 S.Ct. 2106, 2117 (2023). This is a reference to the *mens rea* standard articulated by Justice Kagan in that case where the Court held that proof of a defendant's subjective mindset is required  in true threat cases and that the appropriate *mens rea* standard is recklessness, i.e., a mental state in which a person "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another." 143 S.Ct. at 2117 (quoting *Voisine v. United States*, 579 U.S. 686, 689 (2016)). The Court relied on *New York Times v. Sullivan*, 376 U.S. 254, (1964), among other cases in support of its holding. See e.g. *Id*. at 2130. In her concurring opinion, Justice Sotomayor emphasized *inter alia* that the *Sullivan* recklessness standard adopted by the Court requires "a high degree of awareness that a statement was probably threatening or serious doubts as to the threatening nature of the statement." *Id*. at 2131. She also cautioned that "[e]specially in a climate of intense polarization, it is dangerous to allow prosecutions for heated words based solely on an amorphous recklessness standard. *Id*. at 2132.

This use of *Counterman* by Plaintiffs raises two important issues: (a) whether the decision applies in non-criminal cases; and (b) the impact it has on Plaintiffs' pleading burden. The Supreme Court has previously held that the First Amendment applies in state tort cases. See e.g. *Snyder,* 562 U.S. at 443. Further, Justice Barrett correctly noted in her dissent that "[t]his case is about the scope of the First Amendment, not the

interpretation of a criminal statute. Accordingly, the Court's holding affects the *civil* consequences for true threats just as much as it restricts criminal liability." 143 S.Ct. at 2140 (Barrett, dissent) (emphasis in original). Perhaps most importantly, however, are recent uses of *Counterman* in federal tort claims.  In *Yelling v. St. Vincent's Health System*, the Eleventh Circuit upheld summary judgment against a plaintiff that has alleged racial discrimination (including hostile work environment) and retaliation under Title VII and 42 U.S.C. § 1981 after hearing multiple racial slurs in her workplace. Cause No. 21-10017 (11th Cir. Oct. 5, 2023). The Court affirmed summary judgment in favor of the employer and, in a concurring opinion, Circuit Judge Brasher noted the importance of the First Amendment in determining such claims. *Id*.

Perhaps a more instructive analysis can be found in the very recently decided case of *Fair Fight, Inc. v. Engelbrecht* where the U.S. District Court for the Northern District of Georgia cited *Counterman* in holding the defendant's social media posts were protected by the First Amendment. Civil Action 2:20-CV-00302-SCJ (N.D. Ga Jan 2 2024). The *Fair Fight* case involved a claim under Section 11(b) of the Voting Rights Act. The defendants in *Fair Fight* had publicly (on social media and otherwise) expressed an intent to challenge the eligibility of 364,541 Georgia voters prior to the 2020 Senate Runoff Election, created a "bounty" for individuals who reported fraudulent election activities, and stated that he had recruited Navy SEALS to serve as poll workers. *Id*. The district court noted that the plaintiffs had failed to show the defendants' statements as being true threats because there "[was} no evidence that they were intended to be violent, or made with a *mens rea* of at least recklessness." *Id*. See also *Id.* at n. 78 (noting

25

the adoption of a recklessness rule in both civil and criminal contexts). In light of these extremely recent cases, the *mens rea* standard set forth in Counterman clearly applies to Plaintiffs' claims here.

As previously discussed, Plaintiffs claims are not actionable under the KKK Act. However, if we were to incorrectly assume that freedom from "racial violence" also constitutes freedom from "fear" or "racial intimidation," Plaintiffs' § 1985 and § 1986 claims incontrovertibly become "true threat" cases. The damages these Plaintiffs seek are due to feelings of "fear" or "racial intimidation" by Defendants' alleged actions in stenciling "PATRIOTFRONT.US" over several publicly displayed pieces of artwork on display outside the International Market Plaza. This URL cannot plausibly be considered a true threat within the meaning of the Supreme Court's holding in *Counterman*. See also *Black*. 538 U.S. at 359 – 60.

Further, Plaintiffs' complaint is devoid of plausible allegations that Defendants consciously disregarded a substantial and unjustifiable risk that their conduct would cause the harm of which Plaintiffs now complain. In the *Counterman* opinion itself, Justice Kagan acknowledged that many cases meeting the objective standard of a true threat would be rendered inactionable by the strictness of the *mens rea* standard then adopted. 143 S.Ct. at 2115. In short, the *Counterman* opinion increased the burden that needed to be surmounted before a "true threat" would become actionable or punishable. This is underscored by the facts in *Counterman*: the defendant made numerous menacing statements to the victim even after she had tried to block him. These included statements suggesting that she was being followed, together with

statements such as "Fuck off permanently", "Staying in cyber life is going to kill you" and "You're not being good for human relations. Die." *Counterman*, 143 S.Ct. at 2112. The Court held that these statements alone, without additional evidence of subjective intent, were insufficient. *Id.* at 2119. If these statements were insufficient, so too must be the "PATRIOTFRONT.US" URL at issue in this lawsuit.

**G.     Plaintiffs Claim Under 42 U.S.C. § 1986 Fails Because Its § 1985(3) Claim Fails.**

The broad construction that underlies Plaintiffs' § 1986 claim has no support in any case law. No case known to Defendants has ever affirmatively upheld a stand-alone § 1986 claim with anything approaching substantial analysis. Generally, the courts treat § 1986 as dependent on a viable § 1985(3) claim, and thus, the two stand or fall together. *Barstad v. Murray County*, 420 F.3d 880 (8th Cir. 2005) (citing *Jensen v. Henderson*, 315 F.3d 854, 863 (8th Cir. 2002). In this case, because Plaintiffs cannot allege a plausible claim under § 1985(3), the § 1986 claim must fail.

**H.     IDC's claims for conversion and civil trespass also fail against Defendants due IDC's failure to plead.**

Under North Dakota law, conversion consists of a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over property inconsistent with or in defiance of the rights of the owners. *Ritter, Laber & Associates v. Koch Oil*, 680 N.W.2d 634, 638 (N.D. 2004). The gist of conversion is not in acquiring the complainant's property, but in wrongfully depriving the complainant of the property. *Id.* at 639. Additionally, a conversion must consist of a positive tortious act. *Christensen v. Farmers State Bank of Richardton,* 157 N.W.2d 352, 357 (N.D. 1968).

Neither negligence, active of passive, nor a breach of contract, even though it results in the loss of specific property, constitutes conversion. *Farmers' State Bank of Knox v. Bowles*, 203 N.W. 903, 905 (N.D. 1925).

Under North Dakota law, a civil trespass occurs where a person intentionally and without consent or other privilege enters land in possession of another or any part thereof or causes a thing or third person to do so. *Gray v. Berg,* 878 N.W.2d 79, 82 (N.D. 2016). A claim for trespass cannot exist where there is no intent or affirmative voluntary act by the alleged trespasser. *Id.* North Dakota's law is consistent with Restatement (Second) of Torts § 158 (1965) which provides:

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove.

Comment i to this section addresses clause (a) and states: "The actor, without himself entering the land, may invade another's interest in its exclusive possession by throwing, propelling, or placing a thing either on or beneath the surface of the land or in the airspace above it.... It is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter." *D Enters. v. Liebelt*, 949 N.W.2d 853, 859 (N.D. 2020). There is no indication in case that that the intentional tort of trespass can be committed by means of encouraging or failing to prohibit such an act.

The problem with both of these claims vis-à-vis Defendants is the complete and total failure by IDC to plead any positively tortious actions by either of these defendants. Neither are alleged to have set foot onto IDC's property or to have

personally taken part in vandalizing the murals: these acts are only alleged to have been committed by John Does 1 – 4. See Plts.' Compl. ¶ 35, 56. In contrast, the allegations against Defendants are based upon them allegedly supplying stencils to others and either actively encouraging or failing to prohibit others from carrying out the act of vandalism complained of. See Pls.' Compl. ¶ 27, 31 – 35. Without any plausible allegations of positive tortious acts by either of these defendants, IDC's conversion and civil trespass claims against Defendants must fail.

I.     **IDC cannot simultaneously plead conversion and trespass to chattel.**

 IDC's trespass to chattel claim against Defendants fails for the same reason as its conversion and civil trespass claims; a complete lack of any plausible allegations of positively tortious conduct by these defendants. Defendants now address IDC's trespass to chattel claim separately because it is directly refuted by the claims contained in the Complaint. Specifically, trespass to chattel is generally regarded as differing from conversion only in degree. *Wilkinson v. U.S.*, 564 F.3d 927, 932 (8th Cir. 2009) (citing *Pearson v. Dodd,* 410 F.2d 701, 706 (D.C. Cir. 1969). In this case, Plaintiff's have alleged that the murals were destroyed in their entirety. Plts.' Compl. ¶ 41, 45, 50, 99. In other words, they are only alleging a conversion  - a complete interference in the property – rather than the incomplete interference appropriate to a trespass to chattel claim. *Id.*; *Wilkinson*, 564 F. 3d at 932. Further, they are clearly alleging throughout the Complaint an interference so severe as to justify the remedy of payment for the full value of the mural. *Id.* If the Complaint alleges that the mural was destroyed (a conversion), the

claim of trespass to chattel would be inappropriate to the facts of this case even if these Plaintiffs could show actual involvement by Defendants.

**PRAYER**

Wherefore, premises considered, Defendants pray that this Honorable Court enter an order dismissing Plaintiffs' federal claims under 42 U.S.C. §§ 1981, 1985(3), and 1986, as well as Plaintiffs' state law claims for conversion, civil trespass, and trespass to chattel.

Respectfully submitted,

**MAGANA & VAN DYKE, PLLC**

/s/ Jason Lee Van Dyke
Jason Lee Van Dyke
State Bar No. 24057426
1417 E. McKinney Street, #110
Denton, TX 76209
P – (940) 382-1976
F – (469) 453-3031
Email:  jason@maganavandyke.com

Attorney for Thomas Rousseau and Trevor Valescu

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2024, a true and accurate copy of the foregoing were served via ECF procedures of this Court to all counsel of record.

/s/ Jason Lee Van Dyke
JASON LEE VAN DYKE