# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### EASTERN DIVISION

**NORTH DAKOTA HUMAN RIGHTS COALITION, IMMIGRANT DEVELOPMENT CENTER, and PLAINTIFF DOE,**

          Plaintiffs,

    v.

**PATRIOT FRONT, THOMAS ROUSSEAU, TREVOR VALESCU, and JOHN DOES 1-10,**

          Defendants.

Case No.:  3:23-cv-00160-PDW-ARS

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................. 1

II.    FACTS ALLEGED .............................................................................................. 1

    A.    Patriot Front Is an Organized Hate Group. .............................................. 2

    B.    The International Market Plaza Provides Community for New Americans. .......... 2

    C.    In a Pattern Intended to Intimidate, Defendants Conspired to Commit Racist Vandalism of the International Market. .................................................. 3

    D.    Defendants' Racially-Motivated Actions Caused Fear and Intimidation to Plaintiff Doe and Other Community Members, Interfering with Plaintiffs' Rights to Contract. .................................................. 4

III.    LEGAL STANDARD .......................................................................................... 6

IV.    ARGUMENT ...................................................................................................... 6

    A.    Plaintiffs Have Standing to Assert Their Claims. ..................................... 7

        1.    All Three Plaintiffs Have Article III Standing to Bring Their §§ 1985(3) and 1986 Claims. ................................................ 7

        2.    Plaintiff Coalition Has Suffered Injury Sufficient to Support Standing Under a Diversion of Resources Theory. ................................................ 10

    B.    Plaintiffs Doe and IDC Have Adequately Pleaded Their § 1981 Claim. .............. 11

    C.    Plaintiffs Have Sufficiently Pleaded Their § 1985(3) Claim. .............................. 13

    D.    Defendants' *Counterman* Analysis Does Not Apply to this Case. ...................... 16

        1.    Even if *Counterman* Applies, Plaintiffs Have Sufficient Pleaded the Requisite *Mens Rea*. .................................................. 17

    E.    Plaintiffs Have Sufficiently Pleaded Their § 1986 Claim. ................................. 19

    F.    Plaintiff IDC Has Sufficiently Pleaded Trespass to Property. .............................. 19

    G.    Plaintiff IDC Has Sufficiently Pleaded Conversion. ............................................. 21

    H.    Plaintiff IDC Has Sufficiently Pleaded Trespass to Chattel. ................................. 21

V.    CONCLUSION ................................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Animal Legal Def. Fund v. Reynolds*,
 297 F. Supp. 3d 901 (S.D. Iowa 2018) ................................................................... 10

*Arguello v. Conoco, Inc.*,
 330 F.3d 355 (5th Cir. 2003) ................................................................................... 13

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................. 5, 6

*Bagley v. Ameritech Corp.*,
 220 F.3d 518 (7th Cir. 2000); .................................................................................. 13

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................. 6

*Bray* v. *Alexandria Women's Health Clinic*,
 506 U.S. 263 (1993) ............................................................................................... 14

*Central Specialties, Inc. v. Large*,
 18 F.4th 989 (8th Cir. 2021) .................................................................................... 22

*Chambers v. Omaha Girls Club*,
 629 F. Supp. 925 (D. Neb. 1986) ............................................................................ 14

*Combs v. The Cordish Cos., Inc.*,
 862 F.3d 671 (8th Cir. 2017) .............................................................................. 11, 12

*Cook v. George's, Inc.*,
 952 F.3d 935 (8th Cir. 2020) .................................................................................... 6

*Counterman v. Colorado*,
 600 U.S. 66 (2023) ...................................................................................... 16, 17, 19

*D Enters. v. Liebelt*,
 949 N.W.2d 853 (N.D. 2020) ................................................................................... 20

*Daniel v. Paul*,
 395 U.S. 298 (1969) ............................................................................................... 15

*Domino's Pizza, Inc. v. McDonald*,
 546 U.S. 470 (2006) ........................................................................................... 11, 12

*Elonis v. United States*,
 575 U.S. 723 (2015) ............................................................................................... 17

*Federer v. Gephardt*,
 363 F.3d 754 (8th Cir. 2004) ................................................................................... 14

*Fisher v. Shamburg*,
  624 F.2d 156 (10th Cir. 1980) .................................................................................. 14

*Gregory v. Dillard's, Inc.*,
  565 F.3d 464 (8th Cir. 2009) ................................................................................... 13

*Hampton v. Dillard Dep't Stores, Inc.*,
  247 F.3d 1091 (10th Cir. 2001) ............................................................................... 13

*Henry Hill Oil Servs., LLC v. Stomley Sales & Consulting, LLC*,
  No. 1:20-CV-00214, 2021 WL 6424908 (D.N.D. July 22, 2021) ........................... 23

*Hill v. Bank of Am., N.A.*,
  No. 4:16CV00444-ERW, 2016 WL 6441599 (E.D. Mo. Nov. 1, 2016) ................... 23

*Ho v. Trs. of Grinnell Coll.*,
  No. 4:12-CV-00210, 2012 WL 13024573 (S.D. Iowa Oct. 2, 2012) ....................... 23

*Johnson v. Griffin*,
  69 F.4th 506 (8th Cir. 2023) ................................................................................. 7, 8

*Kluver v. SGJ Holdings, LLC*,
  988 N.W.2d 569 (2023) ........................................................................................... 21

*League of Women Voters of Ark. v. Thurston*,
  No. 5:20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ..................... 10

*Lowden v. William M. Mercer, Inc.*,
  903 F. Supp. 212 (D. Mass. 1995) ........................................................................... 15

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................... 7

*McDermott v. Sway*,
  50 N.W.2d 235 (1951) .............................................................................................. 19

*McLeodUSA Telecomms. Servs., Inc. v. Qwest Corp.*,
  469 F. Supp. 2d 677 (N.D. Iowa 2007) .................................................................... 23

*Means v. Wilson*,
  522 F.2d 833 (8th Cir. 1975) ................................................................................... 15

*Morris v. Off. Max, Inc.*,
  89 F.3d 411 (7th Cir. 1996) ..................................................................................... 13

*Nat'l Fed'n of Blind of Missouri v. Cross*,
  184 F.3d 973 (8th Cir. 1999) ............................................................................. 10, 11

*Sagebrush Res., LLC v. Peterson*,
  841 N.W.2d 705 (N.D. 2014) ................................................................................... 21

*Scott v. District of Columbia*,
  101 F.3d 748 (D.C. Cir. 1996) ................................................................................. 23

*Sioux Biochemical, Inc. v. Cargill, Inc.*,
   410 F. Supp. 2d 785 (N.D. Iowa 2005) ............................................................. 23

*Spirit Lake Tribe of Indians ex rel. Comm. of*
*Understanding & Respect v. Nat'l Collegiate Athletic Ass'n*,
   715 F.3d 1089 (8th Cir. 2013) ........................................................................... 13

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................ 8

*Tholen v. Assist Am., Inc.*,
   970 F.3d 979 (8th Cir. 2020) .............................................................................. 5

*Thomas v. Tops Friendly Markets, Inc.*,
   No. CIVA96CV1579(RSP/GJD, 1997 WL 627553 (N.D.N.Y. Oct. 8, 1997) .......... 15

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022) ..................................................................... 8

*Tibert v. Slominski*,
   692 N.W.2d 133 (2005) ..................................................................................... 19

*United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*,
   463 U.S. 825 (1983) ........................................................................................... 13

*United States v. Bailey*,
   444 U.S. 394 (1980) ........................................................................................... 18

*United States v. Three Juvs.*,
   886 F. Supp. 934 (D. Mass. 1995) ..................................................................... 15

*Virginia v. Black*,
   538 U.S. 343 (2003) ........................................................................................... 10

*Withers v. Dick's Sporting Goods, Inc.*,
   636 F.3d 958 (8th Cir. 2011) ............................................................................. 11

**Statutes**

42 U.S.C.
   § 1981 ....................................................................................................... *passim*
   § 1985 ....................................................................................................... *passim*
   § 1986 ....................................................................................................... *passim*
   § 2000a(b)(2) ........................................................................................... 15

**Other Authorities**

Rest. 2d Torts § 217 ............................................................................................. 21

**Rules**

Rule 12(b)(6) .................................................................................................. 5, 17

## I.      INTRODUCTION

Plaintiffs have alleged Defendants Thomas Rousseau and Trevor Valescu (collectively, "Defendants") are members of Patriot Front, a group that calls for the formation of a white ethnostate and subjugation of people of color.  Defendants' Motion[1] does not deny this. Instead, Defendants expound at length about the Complaint's[2] alleged "political mudslinging" and threats to their hate group's right to organize and campaign.  But as the Complaint alleges, Defendants and their group did not just "organize" and "campaign."  The Complaint alleges that they committed multiple acts of conspiratorial racist vandalism intended to intimidate— and resulting in the intimidation—of Plaintiffs, in violation of both state and federal law.

Defendants' Motion challenges Plaintiffs' standing; argues that Plaintiffs failed to state claims under 42 U.S.C. §§ 1981, 1985(3), and 1986; and failed to state claims under North Dakota common law torts of trespass to property, conversion, and trespass to chattel.  Each of the Motion's arguments is meritless.  Plaintiffs each have standing and the Complaint properly states its claims, which seek to hold Defendants accountable for their acts of hate.

Defendants' Motion should therefore be denied.

## II.      FACTS ALLEGED

Plaintiffs alleged the following plausible facts and reasonable inferences in the Complaint.

---

[1] "Motion" or "Mot." refers to the Amended Memorandum in Support of Defendants' Motion to Dismiss (ECF No. 21). As the Court recalls, Defendants Rousseau and Valescu are the only defendants who have responded to the Complaint. None of the other defendants, including Defendant Patriot Front, have responded.

[2] "Complaint" or "Compl." refers to Plaintiffs' Complaint (ECF No. 1).  Plaintiffs' Opposition incorporates all facts in the Complaint as if set forth fully herein.

### A.   Patriot Front Is an Organized Hate Group.

Non-moving Defendant Patriot Front is a white supremacist group founded in 2017. (Compl. ¶ 21.)  Patriot Front trumpets deeply racist ideologies and publicly proclaims its mission to enforce America's "pan-European identity."  (*Id.*)  And Patriot Front members are not passive believers:  the group's leaders require members to partake in "activism," which frequently takes the form of standardized acts of racist vandalism.  (*Id.* ¶¶ 25, 27.)  Those acts of vandalism often take aim at art installations expressing themes of racial justice and inclusion.  (*Id.* ¶¶ 26, 29-30.)

Defendant Rousseau serves as the National Director of Patriot Front, supervising members' "activism" nationwide and sanctioning high-profile acts of vandalism.  (*Id.* ¶ 33.) Rousseau requires members to participate in these acts under threat of expulsion for noncompliance.  (*Id.*)  Defendant Valescu reports to Defendant Rousseau as a Network Director of Patriot Front.  (*Id.* ¶ 34.)  Defendant Valescu coordinates Patriot Front's efforts in North Dakota, Minnesota, and South Dakota, supplying members with Patriot Front-branded tools for their vandalism and other activations.  (*Id.*)

### B.   The International Market Plaza Provides Community for New Americans.

Plaintiff Immigrant Development Center ("IDC") operates the International Market Plaza, which is a large indoor market in Fargo with community and shop space for immigrant businesspeople and other new Americans.  (*Id.* ¶ 1.)  The International Market Plaza (the "International Market") is home to shops, restaurants, grocery stores, and an after-school program owned and operated exclusively by people of color and immigrants from African, Middle Eastern, and Latin American nations.  (*Id.*)  In addition to fostering a sense of

community, those businesses largely transact in international products that cannot otherwise be obtained in Fargo or its surrounding areas.  (*Id.* ¶ 38.)

On the street-facing side of the International Market building, a large mural celebrates people of color and the community's blend of cultures.  (*Id.* ¶¶ 41, 43.)  With several months of planning, local artists painted this mural in 2017, funded by a $45,000 grant.  (*Id.* ¶¶ 42, 45.)  The art features real individuals who are members of Fargo's immigrant community and frequented the International Market.  (*Id.* ¶¶ 18, 41.)

>       **C.**     **In a Pattern Intended to Intimidate, Defendants Conspired to Commit Racist Vandalism of the International Market.**

During the summer of 2022, Defendants' group escalated their activities in Fargo well beyond the organizing and recruiting that they claim is protected.  On June 17, 2022, Patriot Front members vandalized a local coffee shop and arts collective owned and operated by people of color and LGBTQ+ people.  (*Id.* ¶ 37.)  The defacement read, among other things, "NOT STOLEN; CONQUERED."  (*Id.*)  A little over a month later, on July 31, 2022, further Patriot Front vandalism was reported in the Ninth Street South pedestrian tunnel beneath Interstate 94.  (*Id.*)  Similar messaging appeared, along with images of men bearing riot shields captioned "FOR THE NATION AGAINST THE STATE."  (*Id.*)  Shortly thereafter, a poster reading "Better Dead Than Red," a Cold War-era phrase adopted by Patriot Front, appeared on the doors to the Fargo public school district's headquarters.  (*Id.*)  And in the fall of 2022, Patriot Front defaced public property with its stickering in view of the A&E Liberian Restaurant in downtown Fargo.  (*Id.*)

Then, on September 3, 2022, Defendants and their co-conspirators turned their attention to the International Market.  (*Id.* ¶ 39.)  Under cover of darkness, Patriot Front members trespassed onto the International Market's property and spray-painted their stenciled

logo on the International Market's front windows.  (*Id.*)  The logo is a URL for their website, which is littered with racist and xenophobic propaganda.  (*Id.* ¶¶ 21, 39.)  Just two days later, on September 5, 2022, Patriot Front members invaded the International Market's property again, this time inflicting greater damage.  (*Id.* ¶ 41.)  The vandals destroyed the International Market's treasured and personalized mural by stenciling their logo repeatedly across the artwork, including on top of the faces of the community members depicted.  (*Id.* ¶¶ 41, 44, 46.)  Defendants' and Patriot Front's focus on "pan-European identity" makes clear that they did not cover the International Market in their propaganda in attempts to recruit the immigrants and people of color who shop, work, and play there.  (*See id.* ¶ 21.)  Defendants' only conceivable purpose was to intimidate.

Since targeting the International Market, Defendants have continued to direct Patriot Front members' "activism" in Fargo, in North Dakota at large, and beyond.  (*Id.* ¶ 54.)

### D.   Defendants' Racially-Motivated Actions Caused Fear and Intimidation to Plaintiff Doe and Other Community Members, Interfering with Plaintiffs' Rights to Contract.

Given Patriot Front's widely proclaimed mission of reclaiming America for white Europeans, to the express exclusion of all people of color, their actions were significantly intimidating to Plaintiff Doe and other members of the International Market community fostered by Plaintiff IDC.  For example, the International Market shopkeepers who encountered Patriot Front's initial defacement of the International Market's windows became extremely concerned for their own safety.  (*Id.* ¶ 3.)  They also feared the message the graffiti would send to International Market customers, further extending the reach of Patriot Front's intimidation.  (*Id.*)

These fears were underscored by what appeared to be a pattern of increasing aggression from Defendants' compatriots.  The escalation from vandalizing the International Market's windows to defacing depictions of actual community members felt even more threatening and

seemed to portend future violence.  (*Id.* ¶ 10.)  For example, Plaintiff Doe, whose family

members and close associates are pictured in the artwork Patriot Front destroyed, has installed

security cameras at their residence and adopted additional security measures when visiting the

International Market.  (*Id.* ¶ 18.)

Along with Plaintiff Doe, as predicted, customers and even some shopkeepers themselves

have substantially curtailed their visits to the International Market—or even avoided the

International Market altogether—due to fear of Patriot Front reprisals.  (*Id.* ¶ 11.)

Businesspeople at the International Market raised concerns that Patriot Front's vandalism could

be the precursor to hate crimes or mass violence, specifically recalling the mass shooting at a

Sikh temple in Oak Creek, Wisconsin in 2012.  (*Id.* ¶ 49.)  The International Market limited its

business hours in hopes of addressing security concerns, and its shopkeepers and their employees

now come and go in groups for safety in numbers.  (*Id.* ¶ 59.)  Plaintiff IDC has been forced to

shoulder the financial burden of increased security protection combined with decreased rental

payments caused by declining patronage in light of the community's fears.  (*Id.* ¶ 19.)  And in

providing much-needed support to the International Market, Plaintiff IDC, and the local

community—including by cleaning up Patriot Front's vandalism and fundraising for Plaintiff

IDC—Plaintiff North Dakota Human Rights Coalition (the "Coalition") has been diverted from

pursuing other valuable opportunities to further its own mission.  (*Id.* ¶ 20.)

Due to Patriot Front's threats, as directed by Defendants, Plaintiffs allege that the

International Market community continues to live in a state of hypervigilance, fearing that any

one of their own could be Patriot Front's next target.

### III.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), plaintiffs "need only provide sufficient facts to have 'state[d] a claim to relief that is *plausible* on its face.'" *Tholen v. Assist Am., Inc.*, 970 F.3d 979, 983 (8th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (emphasis in original).  A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  In determining whether a complaint states a facially plausible claim, courts must "accept the factual allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor." *Cook v. George's, Inc.*, 952 F.3d 935, 938 (8th Cir. 2020).

### IV.    ARGUMENT

Defendants' Motion raises several arguments, broadly challenging Plaintiffs' standing and arguing that Plaintiffs fail to state a claim under 42 U.S.C. §§ 1981, 1985(3), and 1986 and under the common law.  Each of the Motion's arguments is meritless.

Plaintiff Doe has plausibly alleged that they, as a person of color and member of the multicultural, multiracial International Market community, have standing because the vandalism Defendants coordinated has caused them to suffer emotional harm and to avoid the International Market.  And Plaintiffs IDC and Coalition have likewise plausibly alleged that they have standing because Defendants' conduct has caused them to bear financial burdens they otherwise would not.

Similarly, Plaintiffs Doe and IDC have sufficiently alleged under § 1981 that Defendants' actions have impaired their ability to contract by casting a shroud of racial intimidation over the International Market and its business.

Plaintiffs have likewise stated claims under both Sections 1985(3) and 1986. The Complaint alleges that Defendants conspired to plan, supervise, and execute a racially motivated act of vandalism with intent to intimidate Plaintiffs and deprive them of equal access to the International Market. Plaintiffs also allege that Defendants actively participated in the conspiracy and failed to stop it, and that the conspiracy was complete and not inchoate.

Finally, Plaintiffs have adequately alleged their common law claims for conversion, trespass, and trespass to chattel. Defendants do not argue that Plaintiffs have failed to plead their common law civil conspiracy claim.

Accordingly, Defendants' Motion should be denied.

### A.      Plaintiffs Have Standing to Assert Their Claims.

For several reasons, Defendants argue that Plaintiffs all lack standing to bring the claims in the Complaint. First, Defendants argue that no Plaintiff has Article III standing to sue under 42 U.S.C. §§ 1985(3) or 1986. (Mot. at 7-10.) Defendants also argue that Plaintiff Coalition lacks standing altogether. (*Id.* at 10-12.) Both of these arguments fail.

### 1.      All Three Plaintiffs Have Article III Standing to Bring Their §§ 1985(3) and 1986 Claims.

To withstand a motion to dismiss for lack of standing, a plaintiff need only allege sufficient facts, accepted as true, to support a reasonable inference that they satisfy the elements of Article III standing. *Johnson v. Griffin*, 69 F.4th 506, 510 (8th Cir. 2023). This pleading burden is "relatively modest." *Id.*

In turn, the familiar three-part test for Article III standing requires a plaintiff to demonstrate that: (1) they have suffered a concrete, particularized, and actual "injury in fact"; (2) the injury is fairly traceable to the defendant's actions; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct" are sufficient to overcome a motion to dismiss. *Id.* at 561.

Defendants challenge only the first standing requirement. In particular, they contend that Plaintiffs' injuries are not concrete.[3] (Mot. at 9-10.) Defendants are wrong.

An injury is "concrete" when it is "real and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (internal citations and quotations omitted). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Id.* at 339 n.7.

Defendants assert, without any supporting authority, that "subjective claims of fear" cannot be sufficiently concrete to constitute Article III injury. (Mot. at 9.) But courts have

---

[3] Defendants do not appear to argue that Plaintiffs' injuries are not actual. However, they do spend nearly a page seemingly arguing that Plaintiffs' injuries—i.e., the fear and intimidation they experienced due to Defendants' hateful conduct—are unreasonable. (*See* Mot. at 8.) But this is not the proper inquiry on a motion to dismiss; facts alleged must be accepted as true. *See Johnson*, 69 F.4th at 510.

Additionally, Defendants merely state without elaboration that "none of these defendants [sic] have suffered a . . . particularized injury with respect to their claims under the KKK Act . . . ." (Mot. at 10.) Defendants say nothing about particularity in this portion of the Motion, though they do make sweeping generalizations about it in their purported summary of Plaintiffs' allegations. (*Id.* at 6.) They seem to claim that the existence of racism does not constitute particularized injury to Plaintiffs. (*Id.*) Plaintiffs have never described and do not now describe their injuries in this way. As discussed below, Plaintiffs have appropriately alleged their own emotional and economic injuries beyond simply "the existence or persistence of racism, white supremacy, or white nationalist sentiment in society at large." (*Id.*)

long recognized emotional harm as a concrete injury sufficient to show standing in the context of §§ 1985 and 1986 claims. *See*, *e.g.*, *Thompson v. Trump*, 590 F. Supp. 3d 46, 71-72 (D.D.C. 2022) (recognizing that § 1985 "makes no distinction between physical and emotional injury" and thereby allows that "emotional harm is sufficiently concrete to establish Article III standing"). Plaintiff Doe has sufficiently alleged emotional harm caused by racially motivated acts of intimidation and harassment, which is a cognizable injury under §§ 1985(3) and 1986. Plaintiff Doe plausibly alleged that they have "experienced emotional, and mental and physical anguish, including chest pains." (Compl. ¶ 18.) The vandalism that Defendants directed, Plaintiffs plausibly allege, caused Plaintiff Doe to fear that they and their community would be targets of race-based mass violence. (*Id.* ¶ 49.) Plaintiff Doe plausibly alleged that their fear and anguish has been intensified by the anti-immigrant propaganda posted at the link stenciled across the International Market, and they feel "increasingly afraid for their personal safety." (*Id.* ¶¶ 52, 61.) These effects of Defendants' organized vandalism—which Defendants themselves concede was "unlawful" and "regrettable"—are sufficiently concrete to confer Article III standing. (*See* Mot. at 8-9.)

Further, no Plaintiff's standing here rests solely on emotional harm. Each Plaintiff has also alleged economic injury. Plaintiff Doe alleged that they have incurred the costs of additional security measures, including installation of security cameras at their residence. (Compl. ¶¶ 18, 61.) Plaintiff IDC allege that it has likewise been forced to expend precious funds on cleanup and additional security measures. (*Id.* ¶¶ 19, 40, 50, 58.) Plaintiffs allege that Defendants' destruction of the International Market building's mural deprived Plaintiff IDC of $45,000 worth of artwork, not to mention the resources Plaintiff IDC expended on obtaining the artwork's grant in the first place. (*Id.* ¶¶ 41-42, 45.) Plaintiffs allege that

because shopkeepers and customers have both curtailed their business with the International Market, Plaintiff IDC, the International Market's landlord and microlender to its businesses, has suffered decreased revenue. (*Id.* ¶¶ 11, 19, 57, 59.) And, as discussed further below and alleged in the Complaint, Plaintiff Coalition, a nonprofit organization, had to repurpose its own limited financial and human resources to support Plaintiff IDC in the wake of Defendants' vandalism, diverting time and money from Plaintiff Coalition's ability to apply for grant funds to further its own mission. (*Id.* ¶¶ 20, 50.) Each of these injuries is adequately concrete and gives Plaintiffs standing to bring their §§ 1985 and 1986 claims.

Lastly, Defendants take a long detour into discussion of whether the emotional harm Plaintiffs allege involved "true threats." (Mot. at 8-9.) But, according to Defendants' own case law, the "true threat" inquiry is part of First Amendment analysis of state restrictions on speech. *Virginia v. Black*, 538 U.S. 343, 359 (2003). That inquiry has nothing at all to do with whether a plaintiff has alleged an injury sufficient for Article III standing—it is simply a red herring.

### 2.       Plaintiff Coalition Has Suffered Injury Sufficient to Support Standing Under a Diversion of Resources Theory.

Defendants offer a misguided and inapplicable metaphor to minimize the legally recognized injury suffered by Plaintiff Coalition.[4] (Mot. at 11-12.) As the Eighth Circuit has recognized, "[s]tanding may be found when there is a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat'l Fed'n of Blind of Missouri v. Cross*, 184 F.3d 973, 979 (8th Cir.

---

[4] Defendants argue that if the Court were to deny their Motion as to Plaintiff Coalition, it would open the litigation floodgates by finding that anyone who assisted Plaintiff IDC in the cleanup efforts would have standing to sue Defendants. (Mot. at 11-12.) Defendants fundamentally misunderstand both Plaintiff Coalition's claim as well as the law on organizational standing through a diversion of resources theory.

1999); *see also Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 913 (S.D. Iowa 2018) (citations omitted) (finding that the organization's diversion of organizational resources were "precisely the sort of injuries that suffice to confer organizational standing"); *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *9 (W.D. Ark. Sept. 29, 2023).

In the wake of Defendants' vandalism, Plaintiff Coalition plausibly alleges that its staff and board members expended time and resources removing Defendants' racist messaging from the International Market, coordinating fundraising efforts, and otherwise responding to Patriot Front's activities in the community.  (Compl. ¶ 20.)   If not for Defendants' conduct "drain[ing] its resources," such time and resources would have been used to further Plaintiff Coalition's mission and activities, including through writing grants and similar activities.  *See Nat'l Fed'n of Blind of Missouri*, 184 F. 3d at 979.  Plaintiffs have adequately alleged that Plaintiff Coalition has standing under a diversion of resources theory.

### B.       Plaintiffs Doe and IDC Have Adequately Pleaded Their § 1981 Claim.

Defendants argue that Plaintiffs Doe and IDC's § 1981 claim fails because they have not identified "any contracts under which they have rights which have been impaired due to the vandalism."  (Mot. at 13.)  But Defendants do not engage further with Plaintiffs' actual claims, instead marching through a litany of distinguishable cases without applying them to the facts alleged here.  (*See id.* at 12-15.)

Section 1981 guarantees all persons "the same right … to make and enforce contracts … as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Though § 1981 requires that a plaintiff "initially identify an impaired contractual relationship under which the plaintiff has rights," this section "does not apply only to existing contractual relationships."  *Combs v. The Cordish Cos.,*

*Inc.*, 862 F.3d 671, 680 (8th Cir. 2017) (internal citations and quotations omitted).  Section 1981 also "protects the would-be contractor along with those who have already made contracts."  *Id.* at 680-81 (citing *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962 (8th Cir. 2011) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).  Section 1981 thus provides for "relief when racial discrimination blocks the creation of a contractual relationship that does not yet exist."  *Combs*, 862 F.3d at 681 (internal citations and quotations omitted).

Plaintiffs' § 1981 claim requires that they show "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant."  *Id.*  Defendants do not argue that Plaintiffs fail to meet the first two elements; Defendants appear to challenge only Plaintiffs' allegations as to the third element.  (*See* Mot. at 12-15.)  This challenge is meritless.

Plaintiffs have sufficiently alleged their engagement in an activity protected by § 1981, specifically "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *See* 42 U.S.C. § 1981(b).  Unlike in *Domino's*, where the plaintiff sued for infringement of his right to make contracts on behalf of another party, Plaintiffs here have alleged their "own contractual relationship[s]" as landlord, lender, and customer.  *Domino's Pizza, Inc.*, 546 U.S. at 479.  As the Complaint explains, Plaintiff IDC is the landlord for the International Market and an after-school program housed there, as well as a microlender for several of the International Market's businesses.  (Compl. ¶ 19.)  Plaintiffs allege that due to Defendants' racially motivated vandalism, the International Market has suffered a decrease in customers, and Plaintiff IDC has thereby been deprived of the financial benefits of its rental and lending contracts with the International Market and its shopkeepers.  (*Id.* ¶ 19.)  Plaintiff Doe, the Executive Director of

Plaintiff IDC, alleged that they are also a patron of the International Market and its shops, which sell international goods that cannot easily be obtained elsewhere in the local community. (*Id.* ¶¶ 18, 38, 61.) Plaintiffs plausibly allege that Defendants' conduct has impaired Plaintiff Doe's ability to contract with the International Market's businesses and purchase such goods.[5] All of these existing and potential contractual relationships involve "mutual intent to create a legal obligation," whether by exchange of rental space, loaned funds, or goods for money. *See Spirit Lake Tribe of Indians ex rel. Comm. of Understanding & Respect v. Nat'l Collegiate Athletic Ass'n*, 715 F.3d 1089, 1093 (8th Cir. 2013).

Defendants attempt to distract the Court with a slippery slope argument, claiming that Plaintiffs seek to "abandon the contract requirement of § 1981," making it a "general federal tort." (Mot. at 15.) Not so. Plaintiffs seek instead to enforce § 1981's protection of the right to contract and specifically its protection of their rights to make and enjoy the benefits of their rental, lending, and purchasing contracts.

### C.     Plaintiffs Have Sufficiently Pleaded Their § 1985(3) Claim.

The crux of Defendants' argument is that Plaintiffs' claim is not based on a right protected against private enforcement. (*See id.* at 15-21.) That argument fails.

Section 1985(3) was originally enacted by Congress to "combat the prevalent animus against [Black people] and their supporters" in the wake of the Civil War. *United Bhd. of*

---

[5] Defendants attempt to characterize Plaintiffs' claims as arising "in the retail context," in efforts to analogize to several cases rejecting § 1981 claims. (Mot. at 13-15.) But the cases that Defendants cite all involve discrimination by the contracting retailer or its employees. *See Gregory v. Dillard's, Inc.*, 565 F.3d 464 (8th Cir. 2009); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001); *Morris v. Off. Max, Inc.*, 89 F.3d 411 (7th Cir. 1996); *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000); *Arguello v. Conoco, Inc.*, 330 F.3d 355 (5th Cir. 2003). Setting aside Plaintiff IDC's obviously non-retail contracts, Plaintiff Doe's claim is different from each of those rejected § 1981 claims because the discriminating party here is Defendants, not the businesses they would have otherwise contracted with but for Defendants' racial intimidation.

*Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983).  As

Defendants acknowledge, the elements of a § 1985(3) claim are (1) a conspiracy (2) for the

purpose of depriving another of equal protection or of "equal privileges and immunities under

the laws"; (3) an act in furtherance of the conspiracy; and (4) an injury or "deprivation of a

legal right."  *Federer v. Gephardt*, 363 F.3d 754, 757-58 (8th Cir. 2004).  Defendants do not

deny that they conspired.  They do not deny that they intended to deprive Plaintiffs of their civil

rights.  And they do not deny that they took overt acts in service of that conspiracy.  For nearly

six pages, Defendants only argue that Plaintiffs were not deprived of the correct kind of "legal

right."  (*See* Mot. at 15-21.)  Defendants are wrong.

Defendants incorrectly assert that § 1985(3) applies only to conspiracies involving

involuntary servitude or interstate travel.  (*Id.* at 16 (citing *Bray* v. *Alexandria Women's Health

Clinic*, 506 U.S. 263 (1993)).)  Not so.  Section 1985(3) serves as a vehicle to remedy violations

of substantive rights guaranteed by federal law or the Constitution.  *Chambers v. Omaha Girls

Club*, 629 F. Supp. 925, 939 (D. Neb. 1986), *aff'd sub nom. Chambers v. Omaha Girls Club,

Inc.*, 834 F.2d 697 (8th Cir. 1987).  For example, "[f]or purposes of redressing conspiratorial

discrimination based upon race, 42 U.S.C. § 1981 may serve as the substantive basis for a cause

of action under Section 1985(3)."  *Id.* at 940.  Plaintiffs Doe and IDC have therefore alleged an

appropriate legal right—the right to make and enforce contracts—underlying their § 1985(3)

claim.  (*See supra* Section IV.B.)

Further, courts around the country have long recognized that enjoyment of a public

accommodation, such as the International Market, is a predicate right for a § 1985(3) claim.  In

*Fisher v. Shamburg*, the Tenth Circuit held that "a racially motivated conspiracy to interfere

with one's enjoyment of a place of public accommodation constitutes a badge of slavery which

is a deprivation of equal privileges and immunities under 42 U.S.C. § 1985(3)."  624 F.2d 156,

162 (10th Cir. 1980).  Similarly, in *Lowden v. William M. Mercer, Inc.*, the court held that

"together with the Thirteenth Amendment, section 1985(3) creates a remedy prescribing [sic]

racially motivated conspiracies which, for example, interfere with a minority person's right to

public accommodation."  903 F. Supp. 212, 221 (D. Mass. 1995).

 The International Market is a place of public accommodation.  The Supreme Court has

recognized that the presence of an establishment covered by the Civil Rights Act within a larger

facility "automatically brings the entire . . . facility within the ambit" of public

accommodations.  *Daniel v. Paul*, 395 U.S. 298, 305 (1969).  In turn, the statutory language

expressly includes restaurants.  42 U.S.C. § 2000a(b)(2).  Because there are restaurants on the

premises of the Market, the Market itself is therefore a public accommodation.  (Compl. ¶ 1);

*see* 42 U.S.C. § 2000a(b)(4); *Thomas v. Tops Friendly Markets, Inc.*, 1997 WL 627553, at *4

(N.D.N.Y. Oct. 8, 1997) (determining retail store was public accommodation because it

contained lunch counter); *United States v. Three Juvs.*, 886 F. Supp. 934, 946 (D. Mass. 1995)

(determining shopping center was public accommodation because it contained restaurants by

analogy to § 2000a).  Plaintiffs have therefore adequately pleaded a predicate right for their §

1985(3) claim: use of the International Market, a public accommodation, by Plaintiffs and other

community members.

 Defendants again make several slippery slope arguments that fail to hold up under closer

inspection.  For example, they argue that § 1985(3) is meant only to prohibit "racial violence"

and that Plaintiffs' claims go beyond the scope of the statute.  (Mot. at 20.)  But the type of

discriminatory action alleged is not part of the § 1985(3) analysis; violence is not required.

Indeed, cases in this Circuit have allowed § 1985(3) claims not based on physical violence to

proceed.  *See, e.g.*, *Means v. Wilson*, 522 F.2d 833, 841 (8th Cir. 1975) (denying motion to dismiss § 1985(3) claim based on harassment and threats).

Then, as they do throughout the Motion, Defendants insist that Plaintiffs' claims endanger the protections of the First Amendment.  (Mot. at 20-21.)  The Complaint does no such thing.  While Defendants argue that these claims would make precedent for individuals experiencing emotional harm from "entirely lawful and constitutionally protected activities," they themselves acknowledge that the conduct Plaintiffs allege here is "unlawful."  (*Compare id.* at 21, *with id.* at 9.)  The basis of Plaintiffs' claims is not merely that Defendants hold hateful and odious beliefs, nor that Defendants' speech is "unpopular"—it is that Defendants' coconspirators trespassed onto Plaintiff IDC's property and defaced it in attempts to intimidate Plaintiffs in line with those beliefs.  (*Cf. id.* at 21.)

### D.    Defendants' *Counterman* Analysis Does Not Apply to this Case.

Defendants next seem to argue that *Counterman v. Colorado*, 600 U.S. 66 (2023), adds a "*mens rea* requirement" to, specifically, Plaintiffs' §§ 1985(3) and 1986 claims.  (Mot. at 21.) This argument must fail, however, because Defendants raise a purely factual dispute. *Counterman* involved a constitutional challenge to a criminal post-trial conviction under state law.  600 U.S. at 71.  Defendants' *Counterman* argument does not apply to the pre-discovery factual dispute in this civil case, which is what Defendants have effectively raised in their Motion.

Plaintiffs' well-pleaded Complaint asserts that Defendants conspired, based on their racial animus, to deprive Plaintiffs of the equal protection of the laws, specifically Plaintiffs' rights to contract and to enjoy the International Market, a place of public accommodation, in violation of 42 U.S.C. § 1985(3).  (Compl. ¶¶ 62-69, 79-83.)  Plaintiffs' well-pleaded

Complaint also establishes that Defendants, beyond being co-conspirators, did not prevent or attempt to prevent the conspiracy, despite holding positions of authority over all the co-conspirators, in violation of 42 U.S.C. § 1986.  (Compl. ¶¶ 70-78.)  Non-moving Defendants acted on the conspiracy by trespassing onto Plaintiff IDC's property and spray-painting links to Defendant Patriot Front's website, which is replete with race-based animus.  (Compl. ¶¶ 2, 39, 44-46.)  Plaintiffs have plausibly alleged that these actions were a clear message to Plaintiffs, Compl. ¶ 12, resulting in the harm and injury to Plaintiffs described in the Complaint.  (Compl. ¶¶ 56-61.)  Defendants, conversely, dispute Plaintiffs' factual allegations:

> In this case, a mere link to the Patriot Front website was neither a communication to the plaintiffs nor was it a communication about the plaintiffs. Yet, from a mere URL, these plaintiffs somehow concluded that a regrettable act of graffiti was more than an immature act of vandalism and was instead a bellwether for risks to the physical safety of Plaintiffs, their tenants, and the business invitees of the International Market Plaza.

(Mot. at 8.)  Defendants thus challenge the facts that Plaintiffs plausibly pleaded, specifically what Defendants intended by their graffiti and whether Plaintiffs' response to the graffiti was reasonable.  This factual dispute, which revolves around the intent behind and response to Defendants' actions, should not be resolved by the Court through a Rule 12(b)(6) motion to dismiss.  *Counterman* is therefore inapposite.

### 1.    Even if *Counterman* Applies, Plaintiffs Have Sufficient Pleaded the Requisite *Mens Rea*.

Even if a *Counterman* analysis applied to this case, Plaintiffs have more than sufficiently alleged facts supporting that Defendants had the requisite *mens rea* for true threats.

As established in *Counterman*, the *mens rea* of recklessness is the minimal level of culpable mental state for true threats. Recklessness requires that the "speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'"

*Counterman*, 143 S. Ct. at 2117 (quoting *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)).  Above recklessness in the *mens rea* hierarchy is knowledge, which requires the speaker to "know[] to a practical certainty that others will take his words as threats."  *Id.*  The highest *mens rea*, purpose, requires that the speaker "'consciously desires' a result," that is, "he wants his words to be received as threats." *Id.* (quoting *United States v. Bailey*, 444 U.S. 394, 404 (1980)).

Plaintiffs' allegations not only demonstrate that Defendants acted recklessly; they establish that Defendants knew of and intentionally organized to ensure their statements were received as threats.  Plaintiffs have plausibly pleaded this in their Complaint.  (*See* Compl. ¶ 12 ("As part of Patriot Front's campaign of vandalism and property destruction, Defendants threatened and intimidated the new American community that maintains, operates, and shops within the International Market Plaza . . . Defendants *were aware* that spray painting white-supremacist logos alongside a minority- and immigrant owned business could cause others to regard their statements as threatening violence and delivered them anyway.") (internal quotations and citations omitted; emphasis added).)  In fact, Defendants do not deny or argue that Plaintiffs have not alleged discriminatory intent.  (*See* Mot. at 12-15.)  Plaintiffs allege that Patriot Front's members have been responsible for dozens of acts of damage to public and private property all over the country, "intimidat[ing] communities based on race and sexual orientation" as "part of their campaign to promote their extreme and racist credo."  (Compl. ¶ 6.)  Defendants' actions here were just another part of this campaign.  Plaintiffs allege that given that Defendants here control Patriot Front's members' vandalism (including providing detailed instructions on what color paints to use and sharing stencils and logos of its insignia, Compl. ¶ 28), it is reasonable to infer that Defendants intended the defacement of the mural and

Plaintiff IDC's front window to be received by the attendants and shop owners, who are exclusively people of color, as a threat, just as Patriot Front's other acts of vandalism had intimidated other communities around the country.  At the very least, there is a plausible inference that Defendants were aware that the Plaintiffs could have received the defacement of the mural and Plaintiff IDC's front window as a threat.  Plaintiffs have therefore adequately pleaded that Defendants acted at least recklessly and Plaintiffs' allegations thus satisfy *Counterman*.

### E.    Plaintiffs Have Sufficiently Pleaded Their § 1986 Claim.

Defendants' only challenge to Plaintiffs' § 1986 claim is that it must fail because the § 1985(3) claim fails.  Plaintiffs do not dispute that their § 1986 claim requires an underlying § 1985 claim.  As Plaintiffs have demonstrated, their § 1985(3) claim is viable and adequately pleaded.  (*See supra* Section IV.C.)  Neither claim should be dismissed.

### F.    Plaintiff IDC Has Sufficiently Pleaded Trespass to Property.

Defendants argue that Plaintiff IDC's trespass claim fails because Plaintiffs have failed "to plead any positively tortious actions by either of these defendants." (Mot. at 27.)  Defendants also suggest that the only way they could be held liable for civil trespass is if they were "alleged to have set foot onto IDC's property or to have personally taken part in vandalizing the murals." (*Id.*)  Both assertions are incorrect.

In North Dakota, civil trespass is "an intentional harm, where a person intentionally and without a consensual or other privilege ... enters land in possession of another or any part thereof or causes a thing or third person to do so."  *Tibert v. Slominski*, 692 N.W.2d 133, 137 (2005) (quoting *McDermott v. Sway*, 50 N.W.2d 235, 240 (1951)) (internal citations and quotations omitted).  An individual who commits a trespass "is liable as a trespasser to the other irrespective

of whether harm is thereby caused to any of his legally protected interests." *Id.* (internal citations and quotations omitted). "If there is no intent or affirmative voluntary act by the alleged wrongdoer, there cannot be a claim for trespass." *Id.* (internal citations and quotations omitted). Further, as Defendants' own authority recognizes, "[i]t is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter." (Mot. at 27 (citing *D Enters. v. Liebelt*, 949 N.W.2d 853, 859 (N.D. 2020).)

Here, the land on which the International Market operates is owned by Plaintiff IDC. (Compl. ¶ 19.) At no point did Plaintiff IDC give Defendants or their cohort permission to enter its property for any purpose, much less vandalize that property with racist slogans. (*See id.* ¶ 94.) And, as alleged in the Complaint, Defendants, through their coordination and instruction, caused Defendant John Does to enter Plaintiff IDC's land without consent, for the purpose of vandalizing the International Market. (*Id.* ¶¶ 27-28, 31, 34, 95.)

Defendant Rousseau does not dispute that as founder and National Director of Patriot Front, he oversees all of Patriot Front's activity and distributes stencils to members across the country. (*See id.* ¶ 31.) He does not dispute that he has encouraged large scale, racially motivated vandalism by Patriot Front members, by making it a requirement for membership and threatening expulsion of members who fail to participate. (*See id.* ¶ 33.) And he does not dispute that he requires members to obtain Patriot Front leadership approval before engaging in large scale mural coverups. (*See id.*) Nor does Defendant Valescu dispute that as Network Director for Patriot Front's Network 11, he provides members with the stencils necessary for large-scale public vandalism, including the vandalism at issue here. (*See id.* ¶ 34.) Such conduct—culminating in Patriot Front members carrying out the physical vandalism of Plaintiff IDC's property—exhibits the required "knowledge that it will to a substantial certainty result in

the entry of the foreign matter." *D Enters. v. Liebelt*, 949 N.W.2d at 859.  Plaintiff IDC's

trespass claim is adequately pleaded.

### G.     Plaintiff IDC Has Sufficiently Pleaded Conversion.

Defendants argue that Plaintiff IDC's conversion claim fails for the same reason as its

trespass claim, because Plaintiffs have failed "to plead any positively tortious actions by either of

these defendants." (Mot. at 27.)  Defendants are wrong.

In North Dakota, "conversion consists of a tortious detention or destruction of personal

property, or a wrongful exercise of dominion or control over the property inconsistent with or in

defiance of the rights of the owners." *Kluver v. SGJ Holdings, LLC*, 988 N.W.2d 569, 576

(2023).  Defendants, through their coordination and instruction, caused precisely that.  At

Defendants' direction and using the stencils provided by Defendants, Patriot Front members

destroyed Plaintiff IDC's property.  (*See* Compl. ¶¶ 33-34.)  Defendants intentionally and

wrongfully exercised control over Plaintiff IDC's outdoor murals, desecrating the artwork and

converting imagery celebrating multiculturalism and diversity into free advertisement for

Defendants' white nationalist propaganda.

### H.     Plaintiff IDC Has Sufficiently Pleaded Trespass to Chattel.

As with the trespass and conversion claims discussed above, Defendants' primary

argument for why Plaintiff IDC's trespass to chattel claim fails is because of "a complete lack

of any plausible allegations of positively tortious conduct by these defendants."  (Mot. at 27.)

Defendants also argue that Plaintiff IDC "cannot simultaneously plead conversion and trespass

to chattel."  (*Id.*)  Defendants are wrong on both points.

First, "[a]n actionable claim for trespass to chattels or personal property generally

requires dispossession of the property, impairment of the condition, quality or value of the

property, loss of use of the property, or other harm." *Sagebrush Res., LLC v. Peterson*, 841 N.W.2d 705, 712 (N.D. 2014); *see also* Rest. 2d Torts § 217 ("A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another.").  "Dispossessing includes taking the chattel from the person in possession without his consent, obtaining possession of the chattel by fraud or duress, barring the possessor's access to the chattel, or destroying the chattel while it is in another's possession.  Intermeddling means intentionally coming into physical contact with the chattel.  Liability arises if the defendant dispossesses the possessor of the chattel, impairs its condition, quality, or value, or deprives the possessor of the chattel's use for a substantial period of time." *Central Specialties, Inc. v. Large*, 18 F.4th 989, 999-1000 (8th Cir. 2021).

As discussed above, the land on which the Market operates is owned by Plaintiff IDC and at no point did Plaintiff IDC give Defendants permission to enter its property for any purpose.  (*See* Compl. ¶ 94.)  And, as plausibly alleged in the Complaint, Defendants, through their coordination and instruction, caused Defendant John Does to enter Plaintiff IDC's land without consent, for the purpose of destroying the mural, a chattel, affixed to the outside of the International Market Plaza building.  (*Id.* ¶¶ 27-28, 31, 34, 99-100.)  This intentional destruction, facilitated and orchestrated by Defendants, dispossessed Plaintiff IDC of the mural by significantly impairing its condition, quality, and value, and permanently depriving Plaintiff IDC and the International Market Plaza of the use and enjoyment of the mural.  The Complaint adequately and plausibly alleges that Plaintiff IDC has suffered a trespass to chattel.

Second, Defendants argue that Plaintiff IDC "cannot simultaneously plead conversion and trespass to chattel." (Mot. at 27.) To the contrary, "parties are allowed to plead alternative and inconsistent theories in their complaints under FRCP 8," as "[t]he liberal policy reflected in Rule 8(d) mandates that courts not construe a pleading as an admission against another alternative or inconsistent pleading in the same case." *Hill v. Bank of Am., N.A.*, No. 4:16CV00444-ERW, 2016 WL 6441599, at *3 (E.D. Mo. Nov. 1, 2016). "Adopting Defendant's position would stifle the liberal alternative pleading policy of Rule 8(d)." *Id.*; *see also Henry Hill Oil Servs., LLC v. Stomley Sales & Consulting, LLC*, No. 1:20-CV-00214, 2021 WL 6424908, at *7 (D.N.D. July 22, 2021) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996)) ("Until an action has actually reached the point of entering a judgment, Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories."); *Sioux Biochemical, Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 801 (N.D. Iowa 2005) (noting that while a party may not ultimately recover duplicative damages, it is generally entitled to assert alternative theories for relief).

Rule 8's liberal permission of alternative pleading has also been specifically applied to claims of trespass to chattel and conversion in this Circuit. *See, e.g.*, *McLeodUSA Telecomms. Servs., Inc. v. Qwest Corp.*, 469 F. Supp. 2d 677, 704–05 (N.D. Iowa 2007) (denying motion to dismiss for claims of trespass to chattel and conversion); *Ho v. Trs. of Grinnell Coll.*, No. 4:12-CV-00210, 2012 WL 13024573, at *5 (S.D. Iowa Oct. 2, 2012) (analyzing trespass to chattel and conversion claims based on the same facts and finding the pleadings sufficient). Plaintiff IDC has therefore appropriately pled its trespass to chattel and conversion claims.

## V.   CONCLUSION

For the reasons stated above, Defendants' Motion should be denied.

Dated this 1st day of March, 2024.

By: /s/ Christine Y. Wong
    Christine Y. Wong (CA Bar No. 284026)
    William Frentzen (CA Bar No. 343918)
    Christina Dierolf (CA Bar No. 335258)
    MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, CA  94105
    Telephone: (415) 268-7000
    Facsimile: (415) 268-7522
    christinewong@mofo.com
    wfrentzen@mofo.com
    cdierolf@mofo.com

    Jon M. Greenbaum (DC Bar No. 489887)
    Arthur Ago (DC Bar No. 463681)
    LAWYERS' COMMITTEE FOR CIVIL
    RIGHTS UNDER LAW
    1500 K Street, NW, Suite 900
    Washington, DC 20005
    Telephone: (202) 662-8600
    Facsimile: (202) 783-0857
    jgreenbaum@lawyerscommitte.org
    aago@lawyerscommittee.org

    Timothy Q. Purdon (ND Bar No. 05392)
    ROBINS KAPLAN LLP
    1207 West Divide Avenue, Suite 200
    Bismarck, ND 58501
    Telephone: (701) 255-3000
    Facsimile: (612) 349-8767
    tpurdon@robinskaplan.com

    Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Christine Y. Wong, hereby certify that on March 1, 2024, a true and accurate copy of the foregoing was served via ECF procedures of this Court to all counsel of record.

 /s/ *Christine Y. Wong*
CHRISTINE Y. WONG